Good morning, your honors. Joshua Jones, fellow defenders, on behalf of the defendant appellant in this matter, Roberto Ortiz-Lareynaga. Just before Mr. Ortiz-Lareynaga signed the form waiving his Miranda rights, one of the agents interviewing him, Agent Selga, told him that speaking to the agents, that telling his story, waiving his Miranda rights, would put him in a better light. The implication of Agent Selga's statement was clear. You can choose whether to talk to us, but silence has its price. How is that the case? I mean, saying that talking to us can, not necessarily will, can put you in a better light, how is that the same as saying that silence is going to be held against you? I mean, he didn't say anything close to what you're talking about. Well, your honor, just to clarify, he did not say that putting you in a better, that it can put you in a better light. He said it puts you in a better light. Okay, fine. And in the context of that, in the context of that, a person hearing that statement is going to think, well, speaking to the agents, it either puts you, you're either put in a better light or you're not put in a better light. If what they're saying is true, that speaking to the agents puts you in a better light, then the converse is also true. So is your position in this case basically that when law enforcement officers are questioning somebody, all they're allowed to do is read the card and say, do you want to talk to us? They're not allowed to say anything at all about, to try to talk the person into it? No, that's certainly not. I mean, that's all they did here, isn't it? No, your honor. Trying to talk him into it. In a pretty low-key way, frankly, I mean, after listening to that, if it had been any more low-key, people would have been falling asleep in the room. Well, your honor, it's not our contention that this was an aggressive or antagonistic interchange between Mr. Ortiz-Laranaga and the agents. However, the supplemental statements that were made by the agents after reading the rights can be taken into account, especially when they have the opportunity, when they have the chance that they will mislead Mr. Ortiz-Laranaga or any person, reasonable person in his position, into understanding what his rights are. So, but you're saying that any time a law enforcement officer says to a suspect, if you say something, it could put you in a better light or it will put you in a better light, that that wipes out the Miranda warnings, which were otherwise accurately read. That's basically your position, right? Not exactly, though. I do think that saying to a person who you just told has the right to remain silent, that speaking to the agents, that waving that rope, that waving rope. Well, in fact, in context, what the agent had just gotten through saying is, there's nothing we can do to help you, basically. I mean, you know, we can't help you. And even the statement that you're just reciting that he made, what he said was it put you in a better light than just driving the car across. Exactly. Because if you've got a good story to tell about why you did it, you know, your mother's sick or this or that or the other thing, that could put you in a better light than just leaving it So? Well, Your Honor, that's not exactly what the agent said. The agent did not say that if you put – I'll read what the quote was. At this point in time, all we can do for you is write your side of what happened today. It puts you in a better light than you just driving your car across, if you understand what I'm trying to tell you. So Your Honor is correct that prior to making the better light statement, the agent does say that we can't do anything more for you than write what your side of the story is. But then he says it puts you in a better light. Now, the interpretation that Your Honor seems to be referring to is that the it that he's referring to is the content of Mr. Ortiz-Vallenaga's story, that if he says something about his sick mother or that he was down on his luck at the time, that that would put him in a better light. But that's not what he said. Well, that was part of the conversation. What definitely? Well, I think a person in Mr. Ortiz-Vallenaga's situation, when he's told it puts you in a better light, when the agents have no idea what his story is, at this point, he has no reason to believe that the agents know that he's not going to say, oh, I thought it was methamphetamine in the car. That certainly doesn't put him in a better light. So Mr. Ortiz-Vallenaga hears this agent say it puts you in a better light. And to take the position that the government is trying to say about that statement is to say that Mr. Ortiz-Vallenaga is going to think, oh, he must be referring to this beneficial story that he doesn't know exists at this point. But in context, isn't that exactly what they were talking about? In other words, the officer, and it's the guy on the right on the video, and I think not the guy on the left, although it's hard to tell sometimes who's talking, but he says, he basically says, all we've got right now is you driving across the car. And basically anybody would understand that to mean it's looking pretty bad for you right now. And he essentially says to him, if you have some facts that would put that in a better light, then now's the time to tell us. Well, Your Honor, I would just disagree. That's not what he said. Okay. But, I mean, looking at cold words on a page is way different. I mean, that's the advantage of the video in this case, that looking at cold words on a page is way different than looking at the entire context of what happened here. Well, I think some other statements helped put that statement into some context that were made earlier. Before this statement about the better light is made, the agents also tell Mr. Ortiz-Laurinaga or attempt to describe a process of what's going to happen. It's not particularly accurate, but I don't think that that's important here. They tell Mr. Ortiz-Laurinaga that what they do is they write a report. That report goes to a judge. The judge looks at the report to see whether or not he's truthful in his statements. Now, so Mr. Ortiz-Laurinaga, when he's told this better light statement, he already has this process or this idea in his mind, or the agents have told him that what they're going to do is write a report of what happens, and that report is going to go to a judge who's going to be able to decide about what happens to Mr. Ortiz-Laurinaga. So it's – Is there something inaccurate about that? Yeah. What is that supposed to note? Well, I don't – the report doesn't go directly to the judge. There's obviously lots of steps that go in between. That's all I meant by saying that it's not entirely accurate, and I don't think that's important to the analysis here. However, I think it is important that Mr. Ortiz-Laurinaga has this idea that they're writing this report that goes to the judge so that when Agent Selga tells Mr. Ortiz-Laurinaga that it puts him in a better light to tell his story. Well, what about the statement – I guess I was just on this panel in Doody v. Shiro, and pretty strong holding in concurrence by Judge Kaczynski, that says that the police can't give you your rights and then make them equivocal. So are you familiar with that case? Yes, Your Honor. It just came out last week. So if they say these – well, if they give the rights and then they say things surrounding the giving of the rights, like, well, we're just here to protect your rights, we're just here to help you, we're just helping you get your side of the story, to put you in a better light, does that undermine the giving of the rights and the – or does it make it more ambiguous? I guess that's what I'm trying to see in light of this new case, this Doody case. Yes, Your Honor. In the Doody case, the Court held that a thing can't be both clear and ambiguous at the same time. And I think the other statement that Your Honor referenced is another one that sheds light on this, puts it in a better light statement. So I think this is a close case. I saw the video, too, and I think the guy on the right was sort of crossing the line more than the guy on the left. In fact, I saw the guy on the left kind of give him a look, like, you know, can't say that. But it's a close thing. I don't think it's true that by talking to them he was going to be in a better light. I don't think it's true that the police are there to protect his rights. That's not what their job is. But how does that undermine the clarity of the Miranda warnings? Well, Your Honor, I think that when he's told, one, about the report going to the judge, two, he's told that they're there to protect his rights, which the truth is the only risk of him – of his rights being violated is because of their presence. And then, third, in that context, they've made it clear that they want him to tell them what happened. Well, if you watch the video, it's perfectly clear he wanted to tell them what happened. I mean, from day one. Your Honor, I don't – He was – he was – he was articulate. He obviously knew what was going on. He said he had family at the New York police. He joked with them. He responded unhesitatingly. And calmly and deliberately. And the rights were administered quite clearly. And I don't – I haven't heard yet why anything that either officer said undercuts the very clear right which he was told, which he read, and which he recited orally. So he got it three times, basically, reemphasized. Well, Your Honor, I think the – the observations that Your Honor's made regarding the DVD are somewhat contradicted by the fact that he doesn't just start talking after they give the – after they give the Miranda warnings. They're significant back and forth. He asks about his options on numerous occasions. But when he was – he asked about his immigration options, for sure. That's correct. But he also asked, do I get immunity? I think he thought he was bargaining for immunity. Well, that was plainly a joke. Your Honor, I think – He chuckles and smiles after he says it. Well, I think perhaps he was confused about, you know, when he was talking to the police about options, that they had any power to give him anything in return for his talking. Your Honor, I think that my – Please answer. Yeah, answer. Because I'm trying to figure this one out. Your Honor, I think he obviously does – does smile after he says, you know, I don't get any immunity. But he's being interrogated by the police. It's an – obviously, it's an uncomfortable situation for anyone to be in. I don't think the mere fact that he smiles after he says it, it's a very odd joke to make at that time if he – if he's not actually trying to inquire or determine something about the rights that were just read. Well, the police don't give immunity, right? I mean, that has to be from the prosecutor. That's correct. Thank you. Okay. Thank you. Mr. Newman. Thank you. Good morning, and may it please the Court. Greg Newman of the United States. First of all, the government would like to point out that there does not seem to be any dispute that the Miranda rights themselves were given in a clear and accurate way, in a very traditional manner. This is not a case like the Duty case in which, as the Miranda rights were given, at the exact same time, read or write, and then have a sort of digression for – I believe they took a one-page form and turned it into over 12 pages of transcript in the Duty case, and that is certainly not what happened in this case. The Miranda rights were clear, they were accurate, and I don't believe there's any dispute about that at all. So this is also not a case like San Juan Cruz, for example, where you've given your immigration rights and then immediately followed up with your Miranda rights, which obviously have a very direct contrast in terms of whether or not you have a right to an attorney. It's also not a case like Connell, in which the actual right to an attorney language is given in two different forms, neither of which is wholly accurate. So what about the argument that Mr. Jones makes about, you know, the comment that, you know, all we've got now is this stuff that looks bad for you, this will put you in a better life. How do you respond to that? The government does not believe that is problematic. It is essentially, along the lines of the Leon Guerrero case, it is speculation that cooperation will be beneficial. And it's certainly in context of the many other statements that were made prior to At no time was Mr. Ortiz told that speaking would not harm him. Well, it said it would put him in a better light. What does that mean, though? To put in a better light to the government implies that you're in a pretty bad situation here, and if you tell your side of the story, you could potentially benefit yourself. The very phrase puts in a better light is, to the government's mind, somewhat of a conditional. It acknowledges that you're in a bad situation and says you could make it better. And that seems to be in keeping with the Leon Guerrero line of cases and not in the line of cases like Geale or Hart, et cetera, where you're specifically told language that directly contradicts Miranda. And I understand that San Juan Cruz, the test is susceptible to equivocation. I think the argument is that put in a better light contradicts that anything you say can be used against you. And the government would argue, and the government does argue, that at no point in time is he ever told that what he says will not be used against him. In fact, Agent Campbell, who is the agent on the left, tells them many times that there's nothing that can be done for him, that no promises can be made for him. I thought that agent wasn't near the line. I thought the one on the right was, you know, stage right or whatever. It was the one who was somewhat making the comments about. How about put in a better light? Yeah, that and the one on the left kept saying we're here to protect your rights. And that's, you have to admit, that's not really the purpose of their job. It's certainly not the sole purpose of their job, correct. It's not the purpose of their job. But isn't there, I mean, they're required to read his rights and then they're required to honor them if he claims them. So in that sense, you know, you could make an argument that they do in some sense, maybe in an attenuated way, protect his rights. Certainly, I think functionally the fact that agents of the law are required to provide the Miranda rights serves as part of the role of making sure that law enforcement agents protect people's rights. I certainly understand Your Honor's point that these are investigative agents. This is a border bust and the government is not going to claim that they did not want him to talk. In border bust cases, this is often your chance to find out what's going on. And also, is it true that they would have in this situation, do they have any power to recommend options to immigration options or immunity? Are they just there to sort of solicit the facts if they can? That's correct, Your Honor. And Agent Campbell was very clear that there was nothing. He told Mr. Ortiz specifically there's nothing we can do for you. But before he signed, he kind of said, well, I can't tell you what we can, we can't have a two-way or a back-and-forth until you do sign. Well, that's, okay, I see what you're saying. So, and I have to admit that, so the Miranda warnings were given in a very clear fashion. After the Miranda warnings were given, let me just check to make sure I'm, I don't want to. No, he didn't sign it right away, right? He did not sign it right away. All right. Here is the sort of the order. Mr. Ortiz first asked about his options, about his, he's told about his consulate options. He asks what other options are available to him. At that point in time, Agent Campbell provides the Miranda rights. After the Miranda rights are provided, and after Mr. Ortiz indicated both orally by responding yes to each right, and in writing by initialing the Miranda form that he understood those rights, Agent Campbell asked whether Mr. Ortiz wanted to tell his side of the story. At that point in time, Mr. Ortiz asked what his options were to stay to take care of his girls. And that's when Agent Selga responded, this specific language is technically we can't talk to you about what your options are because you haven't given us the right to ask questions. And the government argues that in this context, Agent Selga is doing maybe not as artfully as he could. He's doing exactly what he's supposed to do. He's making sure that, listen, we're not, we can't have a back and forth with you. We can't be sitting here and asking you questions that could very well elicit substantive responses related to this crime unless you're going to agree to waive your rights and speak to us. And I think that was what is foremost in Agent Selga's mind and his language at that point. I'd also like to note, excuse me, that later on, as Judge Weimer pointed out, Mr. Ortiz begins spontaneously discussing the drug smuggling before he even agrees to waive his rights. And Agent Campbell affirmatively stopped him. Affirmatively stopped him and made sure, like, wait a second. Here's the form. If you want to waive your rights, read this form out to me aloud. And Mr. Ortiz did that. And the government would argue that's a waiver right there. There's no requirement that the waiver be in writing. And then he waived it again when he actually signed. And Agent Selga's language about puts in a better light came between that first waiver where he accepted orally Agent Campbell's invitation to waive and that second waiver where he actually signed. I think a review of this videotape shows that these agents, though not perfect, were very respectful of the Miranda rights in this case. And the government urges this Court to not make the perfect the enemy of the good. I mean, they do have a right to try to get him to talk, and they didn't take improper measures to do so. If there are no further questions, excuse me, I'll submit. Thank you. Okay. Do you have anything you wanted to add very quickly? The only point I wanted to make was with regard to the comparison to the duty case that was decided last week that was decided under an EDPA standard and therefore required a much more clear violation than this Court would have to find since this case is on de novo review. Okay. Thank you, counsel. The matter just argued will be submitted.
judges: Kennelly, Rymer, Wardlaw